BEN HUR CONSTRUCTION COMPANY, as successor to Superior Structural Steel Co., Appellant,

v.

A.S. GOODWIN, Samuel Spadea, Dennie R. Toney, John Kerr, Kenneth Stewart, W.J. Muse, as Trustees of the National Shopmen Pension Fund, Appellees.

No. 85–1558.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 13, 1986.

Decided Feb. 28, 1986.

---

David F. Yates, St. Louis, Mo., for appellant.

Lena S. Zezulin, Washington, D.C., for appellees.

Before McMILLIAN and JOHN R. GIBSON, Circuit Judges, and MURPHY,* District Judge.

McMILLIAN, Circuit Judge.

Ben Hur Construction Co. appeals from a final judgment entered in the District Court,[1] 607 F.Supp. 383, for the Eastern District of Missouri dismissing its declaratory judgment action against the trustees of the National Shopmen Pension Fund. For reversal, Ben Hur argues that the district court erred in failing to hold as a matter of law that (1) an employer is not subject to withdrawal liability if at the time of withdrawal, the pension plan has no unfunded vested benefits and that (2) the de minimis rule is applicable to reduce any liability it might have. For the reasons discussed below, we affirm the judgment of the district court.

Ben Hur, a Missouri corporation with its principal place of business in St. Louis, Missouri, is the successor of Superior Structural Steel Co. (Superior). Certain employees of Superior were members of and represented by Shopmen Local Union No. 518 of the International Association of Bridge, Structural and Ornamental Iron Workers (Union). Pursuant to agreements between the Union and Superior, Superior made contributions on behalf of its employees to the National Shopmen Pension Fund (Fund). Due to financial difficulties, Superior ceased operations and contributions to the Fund on May 31, 1982.

The Fund, an unincorporated association organized under the laws of Washington, D.C., is a "multiemployer plan," as that term is defined by the Employee Retirement Insurance Security Act of 1974, 29 U.S.C. § 1001 *et seq.* (1982) (ERISA). The Fund is managed by six trustees, three from management and three from labor, who are the defendants-appellees in this case. As of June 30, 1981, the Fund had no unfunded vested benefits; however, Ben Hur's contributions were not sufficient to fund all the vested benefits of its employees.

On July 28, 1983, the trustees notified Superior that Superior had been assessed withdrawal liability in the amount of $69,800, which was to be paid in quarterly installments of $1,514 for 80 quarters. Ben Hur has made the required installment payments under protest.

On September 26, 1984, Ben Hur filed suit in federal district court seeking a declaratory judgment that the Fund trustees may not assert withdrawal liability against Superior because the Fund had no unfunded vested benefits and the trustees erred in refusing to apply the de minimis reduction rule. Ben Hur also sought an order enjoining the trustees from collecting withdrawal

---

* The Honorable Diana E. Murphy, United States District Judge for the District of Minnesota, sitting by special designation.

1. The Honorable Clyde S. Cahill, United States District Judge for the Eastern District of Missouri.

liabilities as a result of Superior's withdrawal from the Fund or initiating any arbitration proceedings, and directing repayment of all sums paid to the Fund by Ben Hur. On April 2, 1985, the district court granted the trustees' motion to dismiss. This appeal followed.

ERISA was enacted in 1974 to regulate employee benefit plans in order to protect the interests of plan participants and their beneficiaries. The Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. § 1381 *et seq.* (1982) (MPPAA), was enacted as an amendment to ERISA in order to discourage withdrawals from multiemployer plans and to reduce the effect of such withdrawals on the plan.[2] Under MPPAA an employer, in addition to its obligation to contribute to the plan, is responsible for a portion of the unfunded vested benefits of the plan. The principal feature of MPPAA is the imposition of liability upon employers when they withdraw from the plan rather than at the time of the plan's termination.

MPPAA established four alternative methods for calculating withdrawal liability. Only the direct attribution method is at issue in this case because the Fund had adopted this method prior to Superior's withdrawal. In order to help small employ-

ers, MPPAA also established a mandatory de minimis rule under which a plan must provide that the employer's liability is reduced by the lesser of $50,000 or ¾ of 1 percent of the plan's unfunded vested obligations as of the close of the plan year ending before the date of withdrawal.

■ Both parties agree that an employer's withdrawal liability is to be based on the unfunded vested benefits. Ben Hur argues, however, that liability is based on the unfunded vested benefits of the whole plan. The trustees argue, on the other hand, that under the attribution method, unfunded vested benefits refer to those attributable to the employer's own work force and not to the unfunded vested benefits of the plan as a whole.

MPPAA states that "the withdrawal liability of an employer to a plan is the amount determined under § 1391 of this title to be the allocable amount of unfunded vested benefits." 29 U.S.C. § 1381(b)(1). Section 1391 provides that "[t]he amount of the unfunded vested benefits allocable to an employer that withdraws from a plan shall be determined in accordance with subsection (b), (c), or (d) of this section." Section 1391(c)(4)[3] describes

---

2. The Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. § 1381 *et seq.* (1982) (MPPAA), was enacted by Congress to encourage the maintenance and growth of multiemployer pension plans. Employer withdrawal from these plans threatened the solvency and existence of these plans.

A key problem of ongoing multiemployer plans, especially in declining industries, is the problem of employer withdrawal. Employer withdrawals reduce a plan's contributions base. This pushes the contribution rate for remaining employers to higher and higher levels in order to fund past service liabilities, including liabilities generated by employers no longer participating in the plan, so-called inherited liabilities. The rising costs may encourage—or force—further withdrawals, thereby increasing the inherited liabilities to be funded by an ever-decreasing contribution base. This vicious downward spiral may continue until it is no longer reasonable or possible for the pension plan to continue.... We think that such withdrawal liability would, first of all, discourage voluntary withdrawals and curtail the current incentives to flee the plan. Where such withdrawals nonetheless

occur, we think that withdrawal liability would cushion the financial impact on the plan.
*Pension Plan Termination Insurance Issues: Hearings Before the Subcomm. on Oversight of the House Comm. on Ways and Means,* 95th Cong., 2nd Sess. 22 (1978).

3. Section 1391(c) provides in part:
(4)(A) The amount of the unfunded vested benefits allocable to an employer under this paragraph is equal to the sum of—
(i) the plan's unfunded vested benefits which are attributable to participants' service with the employer (determined as of the end of the plan year preceding the plan year in which the employer withdraws), and
(ii) the employer's proportional share of any unfunded vested benefits which are not attributable to service with the employer or other employers who are obligated to contribute under the plan in the plan year preceding the plan year in which the employer withdraws (determined as of the end of the plan year preceding the plan year in which the employer withdraws).

the attribution method of determining employer withdrawal liability and governs the plan in the present case. This section provides that an employer's liability is equal to the sum of the "plan's unfunded benefits which are attributable to participants' service with the employer," *id.*, and "a proportional share of any unfunded vested benefits which are not attributable to service with the employer." *Id.* The plan's unfunded vested benefits which are attributable to participants' service are defined as the "value of the nonforfeitable benefits under the plan which are attributable to participants' service with such employer ... decreased by the share of plan assets ... which [are] allocated to the employer." *Id.*

We believe that the statutory language supports the trustees' imposition of withdrawal liability on Ben Hur. MPPAA does not exempt employers from withdrawal liability under the attribution method if the plan as a whole has no unfunded vested benefits. *See generally* General Accounting Office, Effects of Liabilities Assessed Employers Withdrawing from Multiemployer Pension Plans, GAO/HRD–85–16 (Mar. 14, 1985).[4] Withdrawal liability is to be

(B) The plan's unfunded vested benefits which are attributable to participants' service with the employer is the amount equal to the value of nonforfeitable benefits under the plan which are attributable to participants' service with such employer (determined under plan rules not inconsistent with regulations of the corporation) decreased by the share of plan assets determined under subparagraph (C) which is allocated to the employer as provided under subparagraph (D).

4. The General Accounting Office (GAO) found that "[t]hree of the four withdrawal liability allocation methods authorized by MPPAA can result in liability to employers withdrawing from fully funded plans." General Accounting Office, Effects of Liabilities Assessed Employers Withdrawing from Multiemployer Pension Plans 39, GAO/HRD–85–16 (Mar. 4, 1985). GAO suggested that "Congress may wish to consider amending MPPAA to exempt employers in fully funded plans from withdrawal liability. Such an exemption would be consistent with withdrawal liability based on a share of the plan's unfunded vested benefits and should have little effect on the plan or its contributing employers." *Id.* at 40.

determined on an employer-by-employer basis. *Id.* at 39; *see Pension Plan Termination Insurance Issues: Hearings Before the Subcomm. on Oversight of the House Comm. on Ways and Means,* 95th Cong., 2nd Sess. 22 (1978) (statement of Matthew M. Lind, executive director of Pension Benefit Guaranty Corporation).[5] This construction of the statute is consistent with the purposes of Congress in enacting MPPAA—protecting participants' vested benefits in multiemployer plans, encouraging employers to join multiemployer plans, and discouraging employers from withdrawing from such plans. Thus we hold that withdrawal liability may be imposed upon an employer withdrawing from a multiemployer plan which has adopted the attribution method, even if the plan as a whole has no unfunded vested benefits. The liability is to be computed in accordance with § 1391(c)(4), which in this case makes Ben Hur responsible only for the vested benefits of its employees, which have not been fully funded. It is not inequitable that this liability be imposed on Ben Hur rather than on employers who remain in the plan.

The Pension Benefit Guaranty Corporation (PBGC), a government corporation established to administer the insurance program for pension plans, agreed with the GAO that "Congress probably did not intend for an employer to be assessed liability upon withdrawal from a fully funded plan." *Id.* at 39. The PBGC, however, stated that "it is not clear that the law in fact permits assessment in such cases." *Id.*

5. The Executive Director of the Pension Benefit Guaranty Corporation proposed the following approach to the employer withdrawal problem:

To deal with this problem, our report considers an approach under which an employer withdrawing from a multiemployer plan would be required to complete funding its fair share of the plan's unfunded liabilities. In other words, the plan would have a claim against the employer for the inherited liabilities which would otherwise fall upon the remaining employers as a result of the withdrawal....

*Pension Plan Termination Insurance Issues: Hearings Before the Subcomm. on Oversight of the House Comm. on Ways and Means,* 95th Cong., 2nd Sess. 22 (1978).

■ Ben Hur next argues that the trustees should have applied the de minimis rule to reduce any withdrawal liability that Ben Hur had. Ben Hur argues the de minimis rule was enacted to protect small employers from withdrawal liability in situations where the employer's withdrawal from a plan would have no significant effect on the fund's financial well being. Ben Hur argues that the statute and regulations contain only one definition of unfunded vested benefits and the trustees may not use one definition of unfunded vested benefits in determining liability and another in applying the de minimis rule.

The trustees argue that the de minimis rule applies uniformly to all multiemployer plans regardless of the method used to calculate withdrawal liability and is based on the percentage of the plan's total unfunded vested benefits. The trustees argue that the plan has no unfunded vested benefits and therefore Ben Hur's liability cannot be reduced because a percentage of zero unfunded vested benefits is zero.

The de minimis rule provides for a reduction of unfunded vested benefits allocable to an employer that withdraws from a plan. Title 29 U.S.C. § 1389(a) states that the "amount of the unfunded vested benefits allocable to an employer ... shall be reduced by the smaller of (1) ¾ of 1 percent of the plan's unfunded vested obligations or (2) $50,000." The statute supplies definite formulas for determining the "unfunded vested benefits allocated to an employer" and "the plan's unfunded vested obligations." There is no inherent conflict in this statutory scheme. We hold in the present case that the district court properly concluded that the de minimis reduction was zero because the fund as a whole had no unfunded vested obligations.

Accordingly, the judgment of the district court is affirmed.