**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 25-1421

———————

IN RE:  YELLOW CORPORATION, et al.,

Debtors

MFN PARTNERS LP; MOBILE STREET HOLDINGS
LLC;
YELLOW CORPORATION

Appellants

———————————

On Appeal from the United States Bankruptcy Court
for the District of Delaware
(Bankruptcy Court No. 23-11069)
Bankruptcy Judge:  Honorable Craig T. Goldblatt

———————————

Argued June 25, 2025

Before: SHWARTZ, MONTGOMERY-REEVES, and
AMBRO, *Circuit Judges*

(Opinion filed:  September 16, 2025)

Shirley Chan
Kirkland & Ellis
333 W Wolf Point Plaza
Chicago, IL 60654

George W. Hicks, Jr. **[ARGUED]**
Kirkland & Ellis
1301 Pennsylvania Avenue NW
Washington, DC 20004

Laura D. Jones
Peter J. Keane
Pachulski Stang Ziehl & Jones
919 N Market Street
P.O. Box 8705, 17th Floor
Wilmington, DE 19801

Counsel for Appellant Yellow Corporation

Nicholas J. Caluda
Quinn Emanual Urquhart & Sullivan
700 Louisiana Street
Suite 3900
Houston, TX 77002

L. Katherine Good
Maria Kotsiras
Potter Anderson & Corroon
1313 N Market Street
6th Floor
Wilmington, DE 19801

Derek Shaffer **[ARGUED]**
Quinn Emanuel Urquhart & Sullivan
1300 I Street NW
Suite 900
Washington, DC 20005

Eric D. Winston, Esq.
Quinn Emanuel Urquhart & Sullivan
865 S Figueroa Street
10th Floor
Los Angeles, CA 90017

      Counsel for Appellants MFN Partners, LP and
      Mobile Street Holdings, LLC

Samuel I. Levin
Edward J. Meehan **[ARGUED]**
Groom Law Group Chartered
1701 Pennsylvania Avenue NW
Suite 1200
Washington, DC 20006
William D. Sullivan
Sullivan Hazeltine Allinson
919 N Market Street
Suite 420
Wilmington, DE 19801

Counsel for Appellees New York State
Teamsters Conference and Retirement Fund;
Road Carriers Local 707 Pension Fund;
Management Labor Pension Fund Local 1730;
Mid Jersey Trucking Industry and Teamsters
Local 701 Pension and Annuity Fund;
Teamsters Local 617 Pension Fund; Trucking
Employees of North Jersey Pension Fund;
Freight Drivers and Helpers 557 Pension Fund;
Teamsters Local 641Pension Fund

Brad R. Berliner **[ARGUED]**
Andrew J. Herink
Daniel E. Sullivan
Central States Funds Law Department
8647 W Higgins Road
8th Floor
Chicago, IL 60631

4

William A. Hazeltine
Sullivan Hazeltine Allinson
919 N Market Street
Suite 420
Wilmington, DE 19801

       Counsel for Appellees Central States and
       Southeast and Southwest Areas Pension Fund

Emily J. Allender
John Ginsberg
Benjamin T. Kelly
Kartar Khalsa
Rebecca L. Stark
Stephanie Thomas
Andrew P. Walker **[ARGUED]**
Pension Benefit Guaranty Corporation
Office of Chief Counsel
445 12th Street SW
Washington, DC 20024

    Counsel for Appellee Pension Benefit Guaranty Corp.

---

OPINION OF THE COURT

---

**AMBRO**, *Circuit Judge*

Yellow Corporation,[1] once one of the nation's largest trucking companies, went out of business and filed for bankruptcy in 2023. As part of that winddown, it withdrew from several pension plans that secured retirement benefits for Yellow's union workforce. In the bankruptcy, those plans came looking for what they believed they were owed, filing claims against the estate for Yellow's withdrawal liability— what it must pay to the plans for its early exit. Of course, Yellow and the plans disagree on the amount of that liability. And here we are.

Mine-run bankruptcy disputes are about money, but this one is mostly about administrative law. In the midst of the COVID-era economic downturn, Congress granted billions in cash to struggling pension plans through the American Rescue Plan Act of 2021 (ARPA). But the money came with a catch— Congress charged a federal agency, the Pension Benefit Guaranty Corporation (PBGC), with the task of promulgating

---

[1] Throughout this opinion, unless the distinction is relevant, we use "Yellow" to refer to Yellow Corporation, its 23 affiliated debtor entities, and creditors MFN Partners and Mobile Street Holdings, who filed the primary brief challenging the regulations, and whose arguments were joined in full by Yellow.

regulations that would impose "reasonable conditions" on how the pension plans would account for and use that money.

We consider two of those regulations in this appeal. Their upshot is this: The money Congress granted to the plans does not fully count in calculating what Yellow owes to the plans upon its untimely exit. A bigger deficit to fill, a bigger bill to pay. In the Bankruptcy Court, Yellow argued those regulations flouted the statutory scheme that normally governs withdrawal-liability calculations, impermissibly inflating the amount it owes the plans. After the Bankruptcy Court upheld the regulations, we granted a petition for direct appeal of its order on these novel issues. Now, we affirm that order.

## I.     BACKGROUND

Two storylines blend together in this appeal: ARPA and the bankruptcy of Yellow. First, for some context on our dispute, we go back to the enactment of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, the early days of the PBGC, and the subsequent enactment of the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), *id.* § 1381 *et seq.*

### A. ERISA created the PBGC to insure pension funds, and the MPPAA sets out the withdrawal-liability framework underlying this appeal.

Congress enacted ERISA in 1974 to protect retirees' pension benefits. Among the main purposes of this "comprehensive and reticulated statute was to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the

7

plans." *PBGC v. R.A. Gray & Co.*, 467 U.S. 717, 720 (1984) (quotation omitted).

To serve that purpose, Congress established the PBGC. A federal agency and corporation, it operates "a plan termination insurance program" that "collects insurance premiums from covered pension plans and provides benefits to participants in those plans if their plan terminates with insufficient assets" to cover what the participants are owed. *Id.* As detailed below, Congress gave the PBGC wide regulatory authority to achieve this goal. It may issue "regulations as may be necessary to carry out the purposes" of ERISA. 29 U.S.C. § 1302(b)(3). As relevant here, those purposes include "encourag[ing] the continuation and maintenance of voluntary private pension plans" while "provid[ing] for the timely and uninterrupted payment of pension benefits to participants and beneficiaries." *Id.* § 1302(a)(1)–(2).

The PBGC insures both single-employer and multiemployer pension plans (MEPPs). *R.A. Gray*, 467 U.S. at 720. Here, our concern is just the latter: employee benefit plans to which multiple employers contribute through collective bargaining agreements with labor unions. 29 U.S.C. § 1002(37)(A).

At first, ERISA and the PBGC created a kind of moral hazard in MEPPs. When an employer withdrew from a plan, the remaining employers in the MEPP would be responsible for making up the shortfall. Realizing this would increase their burden, other employers would *also* withdraw, leading to a run-on-the-bank-type spiral as more and more employers withdrew. The financial burden then would fall on the PBGC to fill the gap.

8

As a remedy, Congress enacted the MPPAA to impose withdrawal liability on employers that left MEPPs. If an employer chose to leave, then it—rather than the employers remaining in the pension plan and the PBGC—would be on the hook for the departing employer's portion of the shortfall. *Peick v. PBGC*, 724 F.2d 1247, 1267–68 (7th Cir. 1983). By expanding on the initial grant of authority under ERISA, the MPPAA gave the PBGC additional authority relating to withdrawal liability, including the power to prescribe "actuarial assumptions" for calculating that liability. 29 U.S.C. § 1393(a).

Under the MPPAA framework still operative today, a withdrawing employer is responsible for its proportional share of a plan's "unfunded vested benefits." 29 U.S.C. § 1381(b)(1). The formula for calculating a plan's unfunded vested benefits is deceptively simple: the value of the pension benefits vested (and thus owed) minus "the value of the assets of the plan." *Id.* § 1393(c). In other words, the *unfunded vested benefits* are the difference between the plan's *vested benefits* and the *plan's assets*. We say "deceptively" simple because the definition of a plan "asset," and the ways statutes and regulations interact to form that definition, are the core questions here.

There is a limit to this general "proportional share" rule. Per the MPPAA, an employer's total withdrawal liability is amortized into "level annual payments" that are roughly equal to the payments owed in the recent years before the withdrawal. *See* 29 U.S.C. § 1399(c)(1)(A). But an employer's liability is capped at 20 years' worth of such payments—in effect, setting a maximum amount of liability. *See id.* § 1399(c)(1)(B) ("In any case in which the amortization period

9

. . . exceeds 20 years, the employer's liability shall be limited to the first 20 annual payments . . . ."). Still, akin to the operation of an acceleration clause in a standard loan agreement, those annual obligations can be accelerated if the withdrawing employer defaults on the payments. *Id.* § 1399(c)(5).

### B. ARPA infused billions of dollars into MEPPs and authorized the PBGC to impose "reasonable conditions" on MEPPs that received "special financial assistance."

The MPPAA helped, but did not heal, the financial condition of MEPPs. Decades later, COVID made things worse. To respond to the financial crises caused by the pandemic, Congress enacted ARPA to shore up the nation's struggling pension system. *See generally* ARPA, Pub. L. No. 117-2, § 9704, 135 Stat. 4, 190-99 (2021).

Through that law, Congress appropriated funds, deemed "special financial assistance," to support MEPPs. The money would enable receiving plans to pay full pension benefits through at least 2051. 29 U.S.C. § 1432(j)(1). To achieve this goal, Congress instructed that the special financial assistance funds could be used only "to make benefit payments and pay plan expenses" and must be "segregated from other plan assets." *Id.* § 1432(*l*).

Congress delegated to the PBGC the authority to solicit applications for these funds from MEPPs, distribute the money, and issue regulations that placed "reasonable conditions on a[] . . . multiemployer plan that receives special financial assistance," including conditions related to the "allocation of plan assets" and "withdrawal liability." *Id.*

10

§§ 1432(a)(1), (m)(1). At the same time, Congress listed several specific areas that the PBGC could not regulate, like plan personnel, plan governance, and the funding of and accounting for plans in "critical" status. *Id.* §§ 1432(m)(2), 1085(e)(8).

After notice and comment, the PBGC promulgated the two challenged regulations before us. 29 C.F.R. § 4262.16.

The **Phase-In Regulation** prohibits MEPPs from fully counting special financial assistance funds as plan assets all at once. MEPPs must instead *phase in* those funds. *Id.* § 4262.16(g)(2)(viii). In this way, the funds are added incrementally to the plan-assets calculation, the rate determined by the number of years it would take the MEPP to exhaust the special assistance funds, as stated in the plan's application. *Id.* § 4262.16(g)(2)(ix)-(xii).

As a simple example, say a MEPP received $100 million in ARPA special financial assistance, and in its application projected it would take five years to exhaust the funds. The Phase-In Regulation requires that in the first year only $20 million of those funds are counted as plan assets. In the second year, $40 million would count, and so on. This regulation affects withdrawal liability, as an employer that withdrew later would calculate its liability against a bigger base of plan assets, offsetting the amount owed.

The **No-Receivables Regulation** restricts MEPPs from recognizing as an asset any awarded special financial assistance before the funds are paid to the plan. *Id.* § 4262.16(g)(2)(xiii). Like the Phase-In Regulation, this regulation bears on withdrawal liability, as an employer (like

11

Yellow here) that withdrew after the award of funds to a MEPP, but before their actual receipt, would face withdrawal liability that did not account for any special financial assistance funds.

The MEPPs involved in this appeal applied for special financial assistance under ARPA between 2021 and 2022. Collectively, they were awarded $41.1 billion in special financial assistance.

## C. Yellow went into bankruptcy, the MEPPs filed proofs of claim, and we granted a petition for direct appeal.

Unable to resolve a protracted labor dispute with the Teamsters union, Yellow shut down in July 2023 and filed the underlying bankruptcy cases the next month.

Eleven MEPPs are part of the dispute here. Those eleven filed 174 proofs of claim in the bankruptcy case, seeking a combined $6.5 billion in withdrawal liability. For varied reasons all involving the challenged regulations, the pension plans did not include all the special financial assistance funding in their determinations of Yellow's withdrawal liability.

For example, Central States, the pension fund with the largest proof of claim at issue, received its special financial assistance funds in a lump-sum payment on January 12, 2023. For its proof of claim, Central States calculated withdrawal liability "as of the end of the plan year preceding the plan year in which the employer withdraws," like the MPAA requires. 29 U.S.C. § 1391(b)(2)(E)(i). So liability was calculated as of December 31, 2022, as Yellow withdrew upon its 2023

bankruptcy. Because Central States did not receive its special financial assistance until January 2023, the No-Receivables Regulation barred the inclusion of those funds—totaling $35.8 billion—as "assets" in the calculation of withdrawal liability. 29 C.F.R. § 4262.16(g)(2)(xiii).

The ten other MEPPs had received their special financial assistance by the time they filed their proofs of claims, so the Phase-In Regulation applied rather than the No-Receivables Regulation. Yellow's withdrawal liability, calculated accordingly, counted in the balance only some of the special financial assistance funds (those that had been "phased in").

Separate from these regulatory questions, Yellow's withdrawal from the plans also raised a question regarding how to calculate its withdrawal liability under the statutory scheme. In relevant part, two MEPPs—the New York Teamsters Fund and the Western Pennsylvania Teamsters Fund—filed proofs of claim in line with an agreement they made with Yellow in 2013. That agreement allowed Yellow to reenter those MEPPs (it had previously withdrawn) and contribute to its employees' benefits at 25% of its usual rate, which meant diminished accruals for those employees. But in that same contract, the plans and Yellow agreed that if Yellow later faced withdrawal liability, it would do so at 100% of the usual contribution rate. So those MEPPs filed proofs of claim for withdrawal liability at the 100% rate.

After objections and motions, the parties cross-moved for summary judgment on these issues. Before us now is the Bankruptcy Court's Amended Memorandum Opinion and Order, which held in part:

- The Phase-In Regulation and No-Receivables Regulations were valid exercises of the PBGC's statutory authority and were not otherwise arbitrary and capricious; and

- Yellow can be held to its agreement to pay withdrawal liability at 100% of the contribution rate because the statutory formula for calculating withdrawal liability sets a floor on an exiting employer's liability, not a ceiling.

*In re Yellow Corp.*, No. 23-11069, 2024 WL 4925124, at *7-18 (Bankr. D. Del. Nov. 5, 2024).

The Bankruptcy Court certified its order for direct appeal, and we granted the petition to do so. Though the novel issue of the regulations' validity was the basis for the certification, we take the entire order on appeal, so we consider the statutory withdrawal-calculation issue as well. 28 U.S.C. § 158(d)(2).

## II.    JURISDICTION AND STANDARD OF REVIEW

The Bankruptcy Court had core proceeding jurisdiction. 28 U.S.C. § 157(b)(2)(B). We have jurisdiction over this direct appeal of the Bankruptcy Court's order under 28 U.S.C. § 158(d)(2)(A).[2]

---

[2] The appellants who make the main case against the PBGC regulations, MFN Partners and Mobile Street Holdings, spend a significant portion of their opening brief defending their standing under the "persons aggrieved" doctrine, a prudential standing requirement in bankruptcy appeals. Under that doctrine, parties have appellate standing "only if they can show

14

We review a bankruptcy court's rulings on questions of law de novo. *In re FTX Trading Ltd.*, 91 F.4th 148, 152 (3d Cir. 2024).

## III.   ANALYSIS

Yellow argues that the regulations violate the PBGC's statutory authority and are arbitrary, capricious, or otherwise invalid. We first address those challenges to the regulations before moving to the withdrawal-liability calculation issue.

### A. The Phase-In and No-Receivables Regulations are valid.

Yellow lobs a slew of challenges at the regulations. As we explain, each fails.

---

that 'the order of the bankruptcy court diminishes their property, increases their burdens, or impairs their rights.'" *In re Boy Scouts of Am.*, 35 F.4th 149, 157 (3d Cir. 2022) (quotation omitted). We need not consider the doctrine's applicability here, however, as Yellow, which has standing unquestionably, joins in MFN's and Mobile Street's challenge to the regulations. Thus, even if MFN and Mobile Street lack standing to appeal, the issues raised in their briefs would remain properly before us. *See Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab. v. Bethlehem Steel Corp.*, 949 F.2d 185, 186 (5th Cir. 1991) ("Dollins, . . . pursuant to FRAP 28(i) . . . , formally adopted the brief and argument of the Director[, s]o the contentions . . . were clearly before us in the form of arguments advanced, not only by the Director, but by claimant Dollins as well.").

### 1. The Phase-In and No-Receivables Regulations are valid exercises of the PBGC's authority.

Courts must "independently interpret" statutes granting authority to an agency to ensure the agency's actions are within "the boundaries of [its] delegated authority." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) (citation modified). The *Loper Bright* Court rejected the "fiction" that statutory ambiguity is always a grant of authority to an agency. *Id.* at 404. Even so, a "statute's meaning may well be that the agency is authorized to exercise a degree of discretion." *Id.* at 394. Thus, courts must "independently identify and respect such delegations of authority, police the outer statutory boundaries of those delegations, and ensure that agencies exercise their discretion" appropriately. *Id.* at 404.

In this context, Yellow's strongest argument is that ARPA did not grant the PBGC the *regulatory* authority to change the *statutory* formula for withdrawal-liability calculation. In its view, the PBGC did so by excluding the special financial assistance funds from the assets considered in that calculation of "unfunded vested benefits." 29 U.S.C. § 1393(c).

We are not convinced. The Bankruptcy Court put it well: "Congress has expressly granted the PBGC the type of gap-filling authority that *Loper Bright* described, both in ERISA as originally enacted in 1974 and again in the provisions of [ARPA] that are directly at issue here." *In re Yellow Corp.*, 2024 WL 4925124, at *7. In fact, ARPA explicitly grants PBGC the power to set conditions on the

16

"allocation of plan assets," as it did with these regulations. 29 U.S.C. § 1432(m)(1).

Through ARPA, Congress issued the special financial assistance *only* for recipient plans "to make benefit payments and pay plan expenses." 29 U.S.C. § 1432(*l*). But if those funds were included as assets under withdrawal-liability calculation, that would necessarily mean that the funding would subsidize the liability of employers that withdrew from the plans. (And what savvy employer considering withdrawal would not use that opportunity to do so at a withdrawal-liability discount?) If used this way—as an unintentional withdrawal-liability subsidy—the funds would clearly not be for either "benefit payments" or "plan expenses." *Id.* Congress, instead, left it to the PBGC to fill that gap and effect the statute's goals. The agency did so by issuing the two regulations to ensure that the funds are used for the statutorily mandated purpose of being "allocat[ed]" in ways that would comply with ARPA. 29 U.S.C. § 1432(m)(1).

This reading also squares with the Supreme Court's guidance on how to mesh later, specific statutes with earlier, broader ones. A key function of the MPPAA was to prevent pension-plan collapse when several employers withdrew. *E.g.*, 29 U.S.C. § 1381 (establishing withdrawal liability for withdrawing employers). ARPA was meant to bolster struggling plans, and Congress set specific uses for the special financial assistance granted as part of that legislation. In circumstances like this, when "the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand," the "specific policy embodied in a later federal statute should control our construction of the [earlier] statute, even though it ha[s] not been expressly amended."

17

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) (alterations in original) (quoting in the second instance *United States v. Est. of Romani*, 523 U.S. 517, 530–31 (1998)).

As did the Bankruptcy Court, we understand this guidance to control our case. The statutory formula for calculating a plan's "unfunded vested benefits"—from which withdrawal liability is derived—is broad. Original to the MPPAA, it "governs the calculation of withdrawal liability *in general.*" *In re Yellow Corp.*, 2024 WL 4925124, at *9 (emphasis in original). But ARPA "embodied" the "specific policy," *Brown & Williamson*, 529 U.S. at 143, of granting special assistance funds only "to make benefit payments and pay plan expenses," otherwise "segregat[ing]" those funds "from other plan assets," 29 U.S.C. § 1432(*l*). We follow the principle of statutory construction offered in *Brown & Williamson* and conclude that, for calculating withdrawal liability, the more specific provisions of ARPA control over the general provisions of the MPPAA.[3]

---

[3] We emphasize that we do not agree with Yellow's argument that ERISA's plain language forbids the PBGC from promulgating the regulations at issue. ERISA gave the PBGC the authority to define "plans assets . . . by such regulations as" it "may prescribe." 29 U.S.C. 1002(42); *see also Loper Bright*, 603 U.S. at 394 (explaining how Congress can "expressly delegate" that an agency define a term). And the MPPAA likewise allowed the PBGC to "prescribe by regulation actuarial assumptions" for calculating unfunded vested benefits. 29 U.S.C. § 1393(a). Properly understood, then, ARPA's express delegation to the PBGC of regulating the "allocation of plan assets" and "withdrawal liability" relating

18

In this light, the two regulations are "reasonable conditions" on the grant of funds to the plans, promulgated according to Congress's grant of authority to the PBGC in ARPA, 29 U.S.C. § 1432(m)(1).

### 2. The regulations are not arbitrary or capricious.

As part of its scattershot challenge to the regulations, Yellow faults them as arbitrary or capricious. We disagree.

An agency action is "arbitrary or capricious if it is not reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (citation modified). We thus examine whether the agency gave "a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n. of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted). We do not review these policy-making decisions de novo, as courts are forbidden to "substitute their own judgment for that of the agency." *FDA v. Wages & White Lion Invs.*, 145 S. Ct. 898, 917 (2025). We "simply ensure[] that the agency has acted within a zone of reasonableness." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

As the Bankruptcy Court aptly explained, the notice-and-comment process for the regulations was comprehensive. "[I]ndustry stakeholders, including employers, pension plans, actuarial firms, law firms, individuals, and members of Congress" weighed in. *In re Yellow Corp.*, 2024 WL 4925124,

---

to special financial assistance funds follows the well-trod path laid by ERISA and the MPPAA for delegating such power to the PBGC.

at *13. There was even a "listening tour." *Id.* The main thrust of the feedback was a concern "that if special financial assistance were immediately recognized in the calculation of unfunded vested benefits[,] . . . employers would withdraw from the pension plans—leaving those who remain holding the bag." *Id.* These concerns had weight, especially against the backdrop of ERISA and MPPAA's history—"avoiding a circumstance in which one employer's withdrawal from a troubled multiemployer plan would have a cascading effect that would destroy the plan." *Id.* The PBGC issued these regulations to "balance the objectives" set by Congress in the MPPAA and to fulfill ARPA's purpose of strengthening "struggling pension plans." *Id.*

Before us, Yellow does not challenge the breadth of the PBGC's reasoning or the scale of its efforts, but it objects to the agency's conclusions and their consequences.

In the main, it argues that the PBGC's concern—that an influx of funding to the plans would subsidize an employer-withdrawal death-spiral—was misplaced. But Yellow just as quickly concedes that the regulations serve "to discourage employers from withdrawing from financially troubled MEPPs, which might otherwise encourage additional withdrawals and create a downward spiral." MFN & Mobile Street Opening Br. at 45 (quotation omitted). We agree with the latter.

In other places, Yellow disputes certain industry figures and estimates relied on by the PBGC,[4] but these industry

---

[4] Yellow misquotes the PBGC as warning of "a potential surge of employer withdrawal" up to "35% of active members" of

20

figures are "predictive judgments about the likely economic effects of a rule" that courts, including this one, are "particularly loath to second-guess." *Newspaper Ass'n of Am. v. Postal Regul. Comm'n*, 734 F.3d 1208, 1216 (D.C. Cir. 2013) (quotation omitted). We are convinced that the administrative record reflects "reasonable" rulemaking, "reasonably explained." *Ohio*, 603 U.S. at 292. Our "appropriate deference" is owed to "agency decisionmaking," not to Yellow's efforts to convince us it would have gone about the rulemaking another way. *Wages & White Lion*, 145 S. Ct. at 917.

To succeed, Yellow must show that the PBGC's decision-making was so outside the "zone of reasonableness," *Prometheus Radio Project*, 592 U.S. at 423, that it flunks our "deferential" review of agency policymaking, *Loper Bright*, 603 U.S. at 392. For the reasons noted, Yellow has not made that showing.

---

MEPPs receiving special financial assistance. MFN and Mobile Street Opening Br. at 46. The relevant portion of the quoted interim final rule does mention "a potential surge of employer withdrawal," Special Financial Assistance by PBGC, 86 Fed. Reg. 36598, 36619 (July 12, 2021) (to be codified at 29 C.F.R. pts. 4000, 4262). It also displays a single benchmark scenario premised on a 35% withdrawal rate. *Id.* at 36617. But it does not predict the "potential surge" will be "35% of active members." Because the Federal Register does not say this, we do not consider Yellow's arguments premised on the fiction that it does.

21

### 3. Yellow's other arguments fail as well.

We briefly address Yellow's other regulatory arguments.

**(a) The regulations are not conditions on third parties.** The PBGC's regulations are conditions on the plans, in line with Congress's grant of authority. Recall that the relevant regulation says that a "*plan* that receives special financial assistance must be administered in accordance with" the regulations. 29 C.F.R. § 4262.16(a) (emphasis added). The Phase-In and No-Receivables Regulations then instruct the plan how to calculate withdrawal liability in light of the special financial assistance funding. This is a job for the MEPPs themselves: the relevant statutes do "not call upon the [withdrawing] employer to propose the amount of withdrawal liability. Rather, it places the calculation burden on the plan's trustees." *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 197 (1997).

The most forceful part of Yellow's argument is that these regulations are actually conditions on the employers, not the plan. It contends the regulations "directly modify participating employers' statutory rights to have" their withdrawal liability "calculated in the way Congress prescribed." MFN & Mobile Street Opening Br. at 22. But Yellow does not identify the source of those "rights."

In any event, this argument gets it backward. Every clue from the regulatory and statutory text points us to the conclusion that ARPA and the PBGC's regulations are directed at the *plans*, not the employers. As the PBGC said in its brief to us, Yellow's argument "rests on" the "unfounded

22

assumption" that Yellow has "a claim" to the special financial assistance funds. PBGC Answering Br. at 21. It does not. Before ARPA was passed, Yellow was "obligated to pay withdrawal liability to" the MEPPs. *Id.* These regulations "merely preserve[] the *status quo* and prevent[] [ARPA] funds from being redirected to participating employers by reducing their withdrawal liability." *Id.*[5]

**(b) The major questions doctrine does not apply.** The major questions doctrine stands for the following general proposition: An agency cannot take action that results in a "transformative expansion" of its authority—especially over issues of "vast economic and political significance"—without express permission from Congress. *West Virginia v. EPA*, 597 U.S. 697, 716, 724 (2022) (quotations omitted). In those "extraordinary cases," we might "hesitate before concluding that Congress meant to confer such authority." *Id.* at 721 (internal quotation omitted).

This is not an extraordinary case. Congress created the PBGC to set regulations on withdrawal liability, made clear through ARPA it did not want special financial assistance to be used to subsidize withdrawal liability, and charged the PBGC specifically with the task to "impose, by regulation[,] . . . reasonable conditions" related to "withdrawal liability" on any "eligible multiemployer plan that receives special financial assistance." 29 U.S.C. § 1432(m)(1). Far from a

---

[5] The Bankruptcy Court, as a backstop, reasoned that even if these regulations *did* impose conditions on third parties—that is, employers like Yellow—Congress had power under the Spending Clause to do so. *In re Yellow Corp.*, 2024 WL 4925124, at *7–8. We need not address that rationale.

"transformative expansion," this is PBGC business as usual, transacted per "clear congressional authorization." *West Virginia*, 597 U.S. at 723–24 (quotations omitted).

Yellow plays the doctrine as a get-out-of-regulation-free card, but we decline to accept that move.

**B. We affirm the Bankruptcy Court's order on the withdrawal liability calculation issue as to the New York and Western Pennsylvania Teamsters Funds.**

The regulatory issues above were the basis for our granting this direct appeal. But another withdrawal-liability-calculation issue came to us through the operation of the direct-certification statute, by which we exercise jurisdiction over the entire Bankruptcy Court order, not just those novel issues favoring certification. 28 U.S.C. § 158(d)(2). The Bankruptcy Court ruled that the MPPAA permitted two plans, the New York Teamsters Fund and the Western Pennsylvania Teamsters Fund, to enforce their contract with Yellow and demand withdrawal liability at a contractually-bargained-for rate higher than Yellow's actual contributions. We agree.

As background, Yellow reentered the New York Teamsters Fund and the Western Pennsylvania Teamsters Fund in 2013. The reentry agreements allowed Yellow to pay reduced contribution rates for employees, as little as 25% of what would normally be required, leading to diminished accruals for those employees. If Yellow withdrew from the pension plans, both agreements allowed the plans to calculate the withdrawal liability at the full 100% of the contribution rate. Accordingly, the Funds submitted proofs of claim in Yellow's bankruptcy that calculated its liability at the 100%

24

contribution rate.[6] The relevant statutory text suggests withdrawal liability is calculated using an employer's *actual* contribution rates for a time period before the withdrawal. *See* 29 U.S.C. § 1391 (setting out four ways of calculating liability, each of which incorporates this contribution-rate math). Alternative calculation methods are permissible only when a plan obtains PBGC approval, *see id.* § 1391(c)(5)(A); 29 C.F.R. § 4211.23(b), but the New York and Western Pennsylvania funds did not.

Thus here, as in the Bankruptcy Court, Yellow challenges the 100% contribution-rate calculation as a violation of law. But the Bankruptcy Court agreed with the plans that "they did not need PBGC approval" to use the 100% contribution-rate calculation because Yellow "*agreed* to treat [its] withdrawal liability claims in this manner." *In re Yellow Corp.*, 2024 WL 4925124, at *17 (emphasis in original). The Court reasoned that the MPPAA establishes "a withdrawal liability floor, rather than a withdrawal liability ceiling." *Id.* That is because "the MPPAA establishes mandatory liability, overriding contracts that allowed firms to withdraw with an

---

[6] We refer to the agreement as a contract because even an ERISA plan "is nothing more than a contract." *Mirza v. Ins. Adm'r of Am., Inc.*, 800 F.3d 129, 133 (3d Cir. 2015). But we note that the contract issue here was Yellow's agreement to reenter the MEPP under the terms of a rehabilitation plan. *See Central States, Se. & Sw. Areas Pension Fund v. Event Media Inc.*, 135 F.4th 529, 531 (7th Cir. 2025) (explaining that the Pension Protection Act of 2006 requires MEPPs to adopt rehabilitation plans when critically underfunded to change benefit accruals and contributions "that would enable the plan to recover").

effective transfer of unfunded liability to the federal Treasury. It does not forbid employers from agreeing to pay extra money to a pension trust." *Id.* (quoting *Artistic Carton Co. v. Paper Indus. Union-Mgmt. Pension Fund*, 971 F.2d 1346, 1353 (7th Cir. 1992)). And, in any event, because "the purpose of the MPPAA is to ensure the solvency of multiemployer plans, . . . case law has interpreted the statute liberally to protect plans' solvency." *Cent. States, Se. & Sw. Areas Pension Fund v. Laguna Dairy, S. De R.L. De C.V.*, 132 F.4th 672, 678 (3d Cir. 2025).

True, at first glance the contractual provision here seems to run headlong into the statutory requirement that "any other alternative method for determining an employer's" withdrawal liability must be approved by the PBGC. 29 U.S.C. § 1391(c)(5)(A). Yellow would have us believe so. But we do not for two reasons.

First, Yellow never reckons sufficiently with the fact that this approval is required not for every accounting change, but just for those that are a "completely different method" for a plan as a whole. *Peick*, 724 F.2d at 1256. Here, the contract simply made clear that the plan's normal contribution rate and calculation would apply upon Yellow's withdrawal, so we struggle to see how any such change requiring PBGC approval occurred. Second, by statute, any PBGC approval must be "based on its determination that adoption of the method by the plan would not significantly increase the risk of loss to plan participants and beneficiaries or to the corporation." 29 U.S.C. § 1391(c)(5)(A). Although its understanding of the statute is not entitled to deference, *see Loper Bright*, 603 U.S. at 396, we agree with the PBGC that agreements mandating a method whereby an employer agrees to pay more withdrawal liability

26

"pose[] no such risk." PBGC Supp. Br. at 5 (citing PBGC, Opinion Letter 89-8 (Oct. 19, 1989), 1989 WL 224526).

So, bottom line, "employers may waive *limitations* on their withdrawal liability . . . without approval as an alternative method." *Artistic Carton*, 971 F.2d at 1354 (emphasis added) (citing PBGC Opinion Letter 89-8). This flexibility—which results only in employers making higher withdrawal-liability payments, not lower ones—makes good sense. Consider it here: Yellow's contracted-for withdrawal contribution rate was an exchange of (a) greater solvency for the plans in the event of its withdrawal for (b) permission for Yellow to contribute at a lower rate.

Yellow offers no good reason why we should not enforce its own contract against it, instead pointing us to an array of cases in which a plan imposed, without consent, a higher contribution rate on a withdrawing employer's liability calculation. Yellow Withdrawal Br. at 15–22 (collecting cases). That is not the case here, where Yellow *contracted for this result*. We know no convincing statutory case against holding Yellow to its end of the bargain. Seeking to reenter these pension plans, it bargained for a discount on its contributions by offering to pay full freight on its withdrawal liability if the time came. It is here.

\*　　\*　　\*

The PBGC's Phase-In and No-Receivables Regulations were valid exercises of its delegated authority under ARPA, and Yellow must pay the higher withdrawal liability contracted for with the New York and Western Pennsylvania Teamsters Funds. Therefore, we affirm.

27